Case 20-5710 Cynthia Pittman v. Unum Group 2. Defendants' False and Misleading Statements Relating to Unum's Premium Rate Increase Requests of the States 2. Defendants' Misstatements and Omissions Concerning Unum's Reported Loss Ratio, the key metric by which investors were told that they could regard the adequacy of Unum's reserves. The Premium Rate Increase Requests Throughout the class period, the defendants repeatedly told investors that those rate increase requests were going well and that Unum's experiences in that category continued to be consistent with its historical experiences that they had factored into the reserves back in 2014. I'm going to give you just a couple examples. December 15, 2016, quote, we are really right on top of how we thought about the impact of our premium rate increases and our original reserves assumptions, end quote. Let's fast forward a year. December 17, 2017, quote, key messages. We feel really good about our rate increase strategy, end quote. In fact, they told investors they were probably even going to exceed the estimate that they had put in three years ago. None of that was true, your honors. The complaint alleges that by the class periods beginning in October 2016, Unum had already tabulated results contrary to its historical experiences in 25 states. Reduced amounts were being granted, there were longer delays than expected, and there were even outright disapprovals and rejections. Those factors affected 53% of Unum's long-term care premiums, and it totaled some— So I appreciate what you're saying. Can you just walk me through—so in October of 2016, I think that—did you point to that or the—you pointed to the December statement, I'm sorry. In December of 2016, right on top of how we thought about the impact of our premium rate increases. So I assume what you're saying is right on top of is false. Yes. Yes. And let's not forget that is just two months after we—the class period began. At that point, they were already experiencing all of those bad effects that I had tabulated. Okay. So just explain to me how—I mean, right on top of how we thought. So they think they're making progress. Are you saying they weren't making any progress? Because—go ahead. No. No, I'm not—no, no, Judge. I'm not saying they weren't making any progress. I'm saying they were not making the progress that they had assumed they were going to make. They made assumptions in 2014 that they were going to—when they went to the states, historically, we have gone to the states and we've gotten X. All right? We asked for 10. We expect to get 8. And that was our historical experience. What happened is they were going to that state, asking for 10, but they weren't even getting 8. They were getting 6 or they were getting rejected outright. Or they were getting 6 and it was delayed by 19 months or 29 months. That is what made that statement false when they said we are really right on top. And remember, they're speaking to investors. We're at the pleading stage. Whether investors would have regarded that statement as a material falsehood is something that— But they didn't—weren't they provide—I mean, at least they claim—they were providing all the underlying data in their reports. They were—I'm sorry. Go ahead. No, you can say what you were going to say. I interrupted. Go ahead. Well, they were providing underlying data. That's true. Picking and choosing. But again, they weren't—the overall picture of how those rate increase requests were going was not being— These statements that, at least in my experience, executives always make. I mean, they say, look, this is what we think we're doing. We're providing you the underlying data. And then they didn't say we were—our 2014 model is proving out to be true. I don't even think they referenced the 2014 model in any of the statements you mentioned in the complaint. Well, when you say the 2014 model, you mean exact amounts. If that's what you're referring to, Judge, I agree with you. But what they did say was that we reset our expectations in 2014 consistent with our historical experiences. Now, I want to back up just one minute. You said corporations say things like that all the time. That's precisely what the district court here thought, that this was mere corporate puffery. But this court in Bridgestone, as every other circuit in the country, knows that in securities litigation cases, context is key. And what was the context here? The long-term care market Unum and its peers, everybody, with the exception apparently of Unum, was being bushwhacked by hundreds of millions of dollars of costs from these long-term care policies that they couldn't get out of. Unum reassured its shareholders that it was different than General Electric. It was different than Genworth. It was going to smooth over its reserves by going to the states and I'm sorry to skip to your second issue, but you mentioned General Electric, and I didn't understand this argument in your brief as well as maybe I should have. But I thought they were different than General Electric in the group policies. In other words, they had 85% group policies, 15% individual, and they were saying they were different than General Electric. Isn't that a factually true statement? I'm going to answer that very quickly. But my second issue is actually the loss ratio. Yeah. Okay. Go ahead. I'm sorry. That's quite all right. But I will say they said they were different than General Electric, but as we know, they admitted at the class period's end that, to tell you the truth, much of our individual policies were not that inconsistent with General Electric. But let me quickly jump to the second issue, and that's the loss ratio. Please keep in mind that Unum had told investors that figure, that 85% to 90% sweet spot, that is the key metric that you should look at to judge whether or not our reserves are being pressured. So October 2016 started off with a bad number. It was 93.8%. But the defendants said that was basically a one-off. It was attributable to a one-time event. Without that, the ratio would have been in the range. Then they have three straight quarters where the number's hovering at the high end of the range. But suddenly, again, it jumps to 93.3%. Again, the defendants blame it on a one-time event. And they tell investors, quote, we're encouraged that the underlying claims experience was consistent with historical norms. But despite that encouragement, the next two quarters, the loss ratio remained up in the 90s, 93% and 96%. And I would ask your honors to please take a look in the record at page ID 331 through 334, specifically paragraphs 92 through 96. And you will see the following true numbers that illustrate what was truly happening with the underlying claims experience at the time. And I'm going to mention four things. First, by 2017, Unum was stuck with 23% more individual policies than it had assumed it would have at that point. 24,000 policies that couldn't go away. Over the same time period, Unum's actual incurred claims in that group were $257 million higher, a quarter of a billion dollars higher than the underlying assumptions. Third, Unum's claims duration, that is how long a benefit would last, how long a policyholder would remain in a nursing home or in adult care. The claims duration back in 2014 was longer than the insurance industry overall. But Unum had built into its reserves the assumption that it would revert to the industry mark. But that never happened. And the defendants admitted that at the end of the class period. So that's... The loss ratio, didn't they provide accurate historical data? They sure did. They gave that accurate loss ratio every quarter, but a couple points. Number one... Wait, can I add something? Counsel, I have struggled with the loss... Excuse me, Judge Kapar, were you not thinking? No, I've asked enough. You go. I have struggled with the loss ratio, too. What I'm trying to understand is whether the argument that they provided misleading, aside from puffery claims, or is the basic argument that they failed to provide the right quantity or quality of underlying data that came from the reset in 2014? Precisely, Judge Strange. That is exactly what happened. Again, in the securities litigation context, even literally true statements can mislead. That number given every three months was literally true. That's fine. But what they did was they dissembled or they omitted what was happening underneath that number. And we know at the end of the class... What requires you to provide all of that? And I thought they did provide enough of that. But irrespective of that, what specifically requires them to provide all of that? Because in SOFMR, we said if they provide accurate historical data, it can't be the basis of a claim. Agreed. But there's also another securities litigation axiom, and that is having deigned to speak on a subject, they have the duty to speak truthfully and completely about it. Having deigned to speak about that underlying claims experience... You admitted the loss ratio was true and accurate. But they also addressed the underlying claims experience. They would say things like, we're encouraged that the underlying claims experience is consistent with historical norms. I've just given your honors three examples of where those underlying claims experiences deviated wildly to the tune of 250 million dollars from historical norms. I would like to reserve the rest of my time for rebuttal, please. You certainly may. Thank you. Thank you. Mr. Frawley? Yes. Good morning, your honors. Brian Frawley. It is my pleasure to be here on behalf of defendants' appellees. The well-reasoned decision of district court should be affirmed for at least two reasons. First, plaintiff does not plead that any UNAM statement was objectively false and misleading, and the reasons that specific statement was false or misleading, and certainly not with the specificity required by the PSLRA. I understand, counsel, though, isn't there an opportunity for a valid claim of omission of evidence? You can provide what is accurate and not provide information that is necessary to understand the accuracy of what you have already provided. Is that not true under the PSLRA? So, Judge Stratz, I don't think this is a PSLRA question, but it is a basic principle of securities laws is there is no duty to disclose generally. My colleague is correct that if there is a statement made that is misleading on its face, objectively misleading, in the words of this court, nominee care, then there could be a duty to disclose facts necessary to understand what was misleading. But what this court said in Bundali is that there must be an implied misstatement in what was said. It can't be, which is what Mr. Daly has argued to the court a few minutes ago, that additional data would have been helpful or useful or interesting for investors to understand what was an undoubtedly true historical facts. That's not... Well, doesn't the Zalewski standard say that there is a question of whether something's misleading if there's a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available? Why isn't that the standard that governs an omission claim? Well, Judge Stratz, that is the standard, but the standard is tied back to what Unum said. So, there must be a substantial likelihood that what Unum did say on the subject was misleading and misleading in an objective manner, as this court ruled in omnicare. And the problem for the questions this morning in regards to the rate increase claims, Unum said what the rate increase assumptions were and what they achieved there. They achieved two-thirds of their assumptions at year-end 2016, 85% at year-end 2017. To describe that progress as good, nice, great, it doesn't make it objectively misleading. The objective numbers were there for investors to make their judgments. Well, what about, I'm just looking at a couple of the claims in the complaint itself. And, you know, for example, we've got charts at paragraph 92 and 93 comparing actual lives in force to projected lives in force. And, you know, this is said in the context of the chart shows that the in-force lives cumulative deviation from Unum's assumptions was 23%, which is apparently the worst of all its competitors in the industry. Was there not a need to make that information available more clearly to investors? And Judge Stratz, this goes back to one of the underlying defects in this pleading that Judge Corker didn't need to reach because the statements weren't misleading in the first place. But the data that you all just referred to, as alluded to in our brief, are data from Unum's statutory filings that are calculating statutory claims under statutory assumptions. Unum's GAAP financial statements, its annual 10ks, described its reserve testing every year. And the complaint itself admits that Unum's GAAP reserve testing showed a surplus in the reserves. So the comparison the plaintiffs are drawing is an apparition. Well, yes, I understood that. But here's my question. I also understood that the plaintiffs alleged that the SAP versus the GAAP was admitted to overlap in certain areas. And if that's the case, why do we get to do this on a 12b6 motion? Isn't that a dispute of material fact that needs? Well, no, we're not even to the summary judgment standard. Isn't that something that has to be construed favorably to the plaintiffs? So a few things, Your Honor. For one, as the district court ruled, the statements that Unum made weren't misleading in the first place. So whatever data the plaintiff points to was not required to be disclosed to make those statements not misleading. If we were to even get past that, it was plaintiff's burden to point to an orange and compare it to an apple and plead facts as to why that comparison is a valid comparison. What Your Honor just alluded to were not allegations in the complaint. If you look at their brief, it's citations to the transcript at the motion to dismiss stage. Well, actually, I'm looking at paragraphs 93 through 103 of their complaint. Yes. And that's where the charts are. And that's where the comparisons are made. Right. But that's not where the assertion that there is any similarity between SAP accounting and GAAP accounting appears. There's no discussion in the complaint about why that comparison matters. There's just a bunch of- So then that gives the district judge the ability to say, I don't think those are the same things. So I'm going to dismiss the complaint. Doesn't that mean that there is a question that at least needs to be explored in discovery? Well, no, Your Honor, that was a question the plaintiffs need to answer in their complaint. But again, we didn't never judge district court didn't have to get there because these statements that were at issue weren't misleading in the first place. So you didn't have to get to the question as to whether there was a duty to disclose. So what the plaintiffs say you should have disclosed is not that your GAAP financials were deviating from your GAAP financials, is that your statutory numbers were somehow different than what was in your GAAP financials. And that fact was admitted publicly and repeatedly numerous times. Unum told the market that its SAP data was different. If you look at page 968 of the record, 1103 of the record, Unum told the market the statutory financials had higher claims exposure. If you look at page 764, 787, Unum told the market that its statutory reserves were a billion dollars higher than its GAAP reserves. So the plaintiffs needed to come up with allegations as to why those numbers were comparable in a pleading and why that comparison pleads a misstatement. And we submit to your honor, they didn't do so. Now, with regard to the claims about rate increases, all of those claims were accompanied by actual data that is not disputed. The two thirds of the rate increase assumptions were achieved at the end of 2016 and 85% at the end of 2017. So there's nothing misleading about what and while the plaintiffs say the context matters, the context doesn't change that. In the JNR marketing case, General Motors statement that we're making substantial progress funding pension liabilities was found by this court to be puffery. The same holding applies here. With respect to the LTC block composition, my friend this morning admitted that everything said about that LTC ratio was true. What this court has said repeatedly as we were just alluding to in Zalewski in JNR marketing in Ford Motor Company, that truthful statements of historical facts are not misleading and don't give rise to a duty to disclose other details whether they be of interest to investors or not. Here and I agree with you that it was a comprehensive district court opinion. I'm struggling a little bit with what appears to be the standard that was applied by the court. I'm looking for example, you know, my issue is this is a 12 B6 so we're right at the pleading standard which requires the inferences to be favorable to the plaintiff that phase in of the changing premiums. You know, the district court says that Unum noted that it had not received approvals as quickly as originally estimated and that those approvals received had been phased in over a longer time period than originally anticipated. Speaking to the accuracy, the district court was alleging the accuracy of the Unum statements. But then it went on to is not particularly revealing because of its ambiguity. It very well may be speaking of how quickly state regulators were addressing its rate requests, not whether they were actually approving or rejecting the request. So this statement tracks what Unum had been saying. Well, you know, I don't understand it, the position of a judge at 12 B6 to look at a complaint and to say, oh, well, I think this is ambiguous and they could have meant something different. So you didn't state a claim. Can you tell me why that's an appropriate way to address a motion to dismiss under 12 B6? Judge Schratz, I don't believe that comment from the district judge was important or relevant to its conclusion. The district court concluded that the statements that It is true it then engaged in some ruminations as to what somebody else may have interpreted, but that's not relevant to its decision. The decision was the statements that were made were not misleading. That ends the duty to disclose issue that my friends have raised as the basis for having to disclose all these other facts. This is a very unusual securities case. My colleague said this morning, I want to emphasize two facts that are in our complaint. Both of them are true. That's my securities fraud case. What he didn't say this morning or get to at all was what his fraud theory is and how those truthful statements nevertheless have some basis of inferring Sienta. And what the plaintiffs needed to do in that regard, as this court ruled in Omnicare, was to first allege particularized facts showing a cogent or powerful inference of fraud. Next, they needed to balance that inference against any competing inferences and the complaint survives only if fraud is at least as compelling as any other inference. Which of the cases you've cited, do you think are most comparable to this case where there was a dismissal? So most comparable, Your Honor, I would say would be the Bundali case because that case, the plaintiffs, much like this case, relied on Sienta theories as opposed to Sienta facts. But if you look beyond Bundali, this court's decision in Conkle, in Doshi, in Omnicare had far more egregious facts on Sienta, including confidential witnesses, including pleading internal information that the plaintiffs eschewed pleading here at all. And Mr. Faralli, I guess in referencing what Judge Strange, she makes in my mind a lot of good points. And so go back to the standard for a second and just walk me through. Is it truly, I mean, I guess we should think of it as a 12 v. 6. Is that what it was? But it seems to me we have to review it against the backdrop, the 12 v. 6 of the PSLRA. So how should we take those statements? Because the PSLRA says that we have to, they must specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading and state it with particularity facts giving rise to a strong inference. And I think you were getting at this, but what is strong inference mean in that context when you're reviewing it against the 12 v. 6, where you take all inferences in favor of the plaintiff? How do we put those together in your mind? So I think you have to separate them for the misstatement aspect of the case and the Sienta aspect of the case and look at the two parts of the PSLRA separate. As Judge Strange alluded to in connection with the misstatements, the PSLRA doesn't change the rule that plaintiffs are entitled to any plausible inferences from its allegations. And what it does change is that those allegations must plead the misstatement, each one separately and identify it, and then allege with particularity the reasons why it's misleading, which I submit my colleague this morning admitted didn't happen. And then when you get to the Sienta part of the equation, there the plaintiffs are no longer entitled to every inference. They're and then the court looks holistically at all of the allegations and determines whether or not they first produce a powerful or cogent inference of fraud. Then only if you get past that, you consider all other inferences from the facts and the record. And I cut to the chase just of where I was going. So it seems to me your argument is A, the statements were false or misleading, but B, even assuming they were, the plaintiff never overcame the higher hurdle, even with 12B6 of Sienta because of the PSLRA. Is that accurate? That is correct, Judge LaPorte. And one other aspect before my time comes out here, the plaintiffs acknowledge in their brief that at least some of their claims are subject to an actual knowledge Sienta standard. As we argue in our brief, virtually all of their claims are subject to such a standard because it's all soft information and the like, but they don't even argue that they've met that standard. And I see my time is up unless the court has other questions. The defendants rest on their brief. Thank you, Mr. Farag. Appreciate your argument. And Mr. Daly, you have four minutes of rebuttal. Thank you, your honors. Four minutes, four points. The first one I'm going to go over very quickly, the SAP versus GAP. The district court didn't even reach that issue, so your honors were correct. I don't even know why we're talking about it, but I will say this. One of the defendants did admit, generally speaking, the assumptions that we use to file rate increases and support those are the same that we're using for reserve adequacy under both statutory and GAP. So that everything you said about loss ratio is true. That is not true. I said that the hard numbers in isolation, once every three months were accurate. I said the underlying statements that they made repeatedly, that the claims experience was consistent with what they had gone through historically was false and misleading. Those were the false and misleading statements regarding the loss ratio. Third point, counsel said you didn't need to give additional data just to make it interesting to investors, just because investors would have wanted some more information. Well, that additional data came out at the end of the class period. And that's when the defendants themselves admitted that they hadn't received those state rate increase approvals as quickly as historically expected. Those increases that they did get had been phased in over a much longer time period than they had expected. And notably, that those shortfalls would increase UNUM's loss ratio by three to 4%. And that was three to 4% that UNUM could not afford. Fourth point, counsel has his favorite scienter case. I have mine. It happens to be Dana. I argued that case in front of two of the three judges sitting here today. And in that case, we had top executives talking repeatedly to the market about a key segment of their business. And that raised a strong inference of their scienter. We have the same thing here. We've got McKinney and McGarry, the two top executives at the company, both men with long, long experience and long term care, closed block experience, repeatedly speaking to the market, telling the And yet during the class period, everything's going swimmingly. There's a couple blips here and there, a couple glitches, but those glitches are glossed over. They're one-offs. They're aberrations. And yet at the end of the class period, when they do have to come clean, they admit that the rate increases were taking longer than expected. They admit that we're going to have to revisit our reserves assumptions now because our loss ratio has now been up over 93%, several straight quarters. So I think factors like that, when you consider them holistically and compare them to the perhaps innocent explanations on the other side of it, they are at least as compelling as any inferences arising in Unum's favor. And at that point, because this is a 12B6 matter, we get past the motion to dismiss and we get to move on to discovery, summary judgment, and trial. Your Honors, I think taking all of our allegations as true and crediting the inferences in our favor where they should be credited, I would say that we have pleaded a strong inference of false and misleading statements made with knowledge and that we respectfully ask the court to reverse the both of you for your arguments this morning. We certainly appreciate them and we will take the matter under advisement, this being the only case we have on the oral argument calendar this morning. You may adjourn court, Mr. Gifford. This honorable court is now adjourned.